OPINION OF THE COURT
Herman Cahn, J.
Plaintiffs move and defendants cross-move for an order, pursuant to CPLR 3212, granting summary judgment in their respective favor.
This action involves the right of private housing companies participating in the Mitchell-Lama program to "privatize” or buy their way out of regulation by the city by prepaying their outstanding mortgage indebtedness, presumably so that they can "go private” and sell shares of stock or the apartments at market prices to the highest bidder rather than being limited to charging below market rents to people of low or moderate income. Plaintiffs are the owners and operators of several Mitchell-Lama housing projects in the City of New York, organized as limited profit housing companies pursuant to the Private Housing Finance Law. Defendant City of New York Department of Housing Preservation and Development (HPD) is the holder of mortgage notes representing low-cost mortgage loans made to the plaintiffs for construction of the Mitchell-Lama projects.
Plaintiff 2550 Olinville Avenue, Inc. (Olinville) seeks to *808 prepay a second mortgage lien on premises known as the Olinville Arms which is secured by a mortgage note dated August.8, 1978, in the amount of $1,031,457^02 (the Olinville mortgage). This note evidenced a portion of the indebtedness under an original and prior note executed by Olinville’s predecessor in 1965. In 1978, the 1965 mortgage was recast into a first mortgage insured by the Federal Department of Housing and Urban Development (HUD) in the amount of $2,251,100.
The note secured by the Olinville mortgage contains the following provision: "There shall be no right of prepayment prior to the HUD Release Date. Subsequent to the HUD Release Date, privilege is reserved to pay the debt in whole or in an amount equal to one or more monthly payments on principal next due, on the first day of any month prior to maturity upon at least thirty (30) days’ prior written notice to the holder.”
The note defines the HUD release date as the date "after the Secretary of Housing and Urban Development * * * shall cease to hold or insure the HUD Note and Mortgage.” Olin-ville paid the HUD mortgage on December 1, 1988.
Plaintiff Leland Corp. (Leland) seeks to prepay a mortgage dated April 8, 1963, in the amount of $8,070,000.
Plaintiff Kingsbridge Corp. (Kingsbridge) seeks to prepay a mortgage dated October 5, 1962, in the amount of $3,395,000.
The Leland and Kingsbridge mortgages each contain the following provisions with respect to prepayment: "with the privilege to the Maker of prepaying all or part of the principal sum hereof at such time or times, in such amount or amounts, and on such terms as the Housing and Redevelopment Board of the City of New York may authorize and approve.”
Relying on the privilege set forth in the notes, in July 1987, each of the plaintiff companies notified HPD in writing of their intent to prepay the mortgage notes. Olinville had procured a refinancing commitment and was scheduled to close on October 1, 1987. Leland and Kingsbridge had entered into a contract of sale of their properties for August 3, 1987 to a third party. They were unable to close because of HPD’s refusal to accept prepayment of the mortgage and allegedly lost $13,700,000 in anticipated profits.
On September 30, 1987, HPD informed plaintiffs’ attorneys that it would not accept prepayment. At the time, HPD explained that it was in the process of developing regulations *809 on the subject of voluntary dissolution of Mitchell-Lama projects, in view of the potential ramifications for tenants in these projects.* On February 11, 1988, HPD promulgated emergency regulations outlining procedures to be followed before a company operating a city-sponsored Mitchell-Lama housing project could be dissolved.
On or about December 1, 1988, the city agreed to accept prepayment of Olinville’s second mortgage. On or about February 13, 1989, the city accepted prepayment of Leland’s and Kingsbridge’s mortgages. Therefore, to the extent that the complaint seeks to compel specific performance, it is moot. Therefore, the first and second causes of action are dismissed as moot to the extent that plaintiffs seek to compel defendant to accept prepayment of their respective mortgages. The other causes of action seek to recover money damages for breach of contract.
A mortgagor has the right to prepay an obligation secured by a mortgage, prior to maturity — and a mortgagee is obligated to accept payment thereof — only if a prepayment privilege is contained in the mortgage documents or is authorized by statute (Matter of Arthur v Burkich, 131 AD2d 105, 106 [3d Dept 1987]). Prepayment clauses give the mortgagor the option to voluntarily terminate the mortgage prematurely. Such prepayment clauses will be enforced according to their terms (George H. Nutman, Inc. v Aetna Business Credit, 115 Misc 2d 168, 169 [Sup Ct, Queens County 1982]).
In the case at bar, the right to prepay the Olinville mortgage was expressly conditioned upon the giving of at least 30 days’ written notice to HPD subsequent to the HUD release date, i.e., after HUD ceased to hold the first mortgage. The note expressly states that prior to the HUD release date, there shall be no right of prepayment. Since Olinville did not pay off the HUD mortgage until December 1, 1988, HPD acted within its rights in refusing to consent to prepayment of the second mortgage when Olinville made its request in July 1987. Put another way, Olinville had no contractual right in July 1987 to request that HPD consent to accept prepayment of the Olinville mortgage, since that request was prior to the HUD release date, as defined in the parties’ agreement. That HUD *810 had agreed to close on prepayment of its mortgage is immaterial insofar as HPD is concerned. What is material and dispositive under the parties’ agreement is that the HUD mortgage was still extant.
Nor may Olinville assert that HPD should be estopped from asserting its noncompliance with the above condition based upon the fact that HPD, by an employee, albeit a highly placed employee, had indicated that it would consent to prepayment of the second mortgage upon receipt of certain specified information and documentation from Olinville, which information allegedly was furnished promptly.
A governmental entity is not bound by the mistaken advice of its employees (London v Hammel, 32 AD2d 639 [2d Dept 1969], mot to dismiss appeal denied 26 NY2d 830 [1970]), and estoppel is not available to preclude a governmental entity from discharging its statutory duties (Scruggs-Leftwich v Rivercross Tenants’ Corp., 70 NY2d 849, 852 [1987]). Here, HPD was acting in a governmental rather than proprietary capacity in enforcing the statutes and regulations governing Mitchell-Lama. housing and in enforcing the Private Housing Finance Law. Therefore, it will not be estopped from strictly enforcing the letter of the law. Moreover, estoppel, which is an equitable defense, is a shield, not a sword; estoppel will not operate to create a right where none exists (Matter of Cochran v New York City Employees’ Retirement Sys., 131 AD2d 351, 354 [1st Dept 1987]). As stated supra, the agreement expressly provided that until the HUD release date "[t]here shall be no right of prepayment”. Therefore, defendants acted wholly within their rights in refusing to consent to Olinville’s July 1987 request to prepay the second mortgage.
Accordingly, that branch of defendant’s cross motion seeking summary judgment dismissing Olinville’s breach of contract claim is granted, and it is dismissed. This is without prejudice to Olinville’s right to prepay the second mortgage, now that it appears that the HUD mortgage has been paid.
Plaintiffs Leland and Kingsbridge stand on a different footing. They were not subject to the HUD release date provision contained in the Olinville mortgage. They gave the requisite 30-day notice, and defendants have failed to come forward with any evidence as to the existence of a bona fide defense to the breach of contract claims asserted by Leland and by Kingsbridge.
Voluntary dissolution of Mitchell-Lama housing companies *811 is governed by Private Housing Finance Law § 35 (1), which applies to housing companies aided by loans made prior to May 1, 1959. It requires the consent of the Commissioner or of the supervising agency, not less than 35 years after the occupancy date, upon the payment in full of the remaining balance of unpaid principal and interest upon the mortgage held by the State or municipality, and all accrued taxes for which tax exemption was granted and received. Although the low-interest loans and municipal tax exemptions attracted some developers to build and rent Mitchell-Lama housing at low cost for middle income residents, as the father of the Mitchell-Lama law, MacNeil Mitchell wrote: "the limited 6 percent annual return and lack of potential capital appreciation were serious disincentives to private sector involvement; some other incentive appeared to be necessary to stimulate private investment. [The committee] determined that the prohibition of voluntary dissolution for 35 years, and then only with the consent of the housing commissioner, was the primary disincentive to private sector involvement” (affidavit of Mac-Neil Mitchell, in Matter of Winthrop Gardens [Elmicke], Sup Ct, Albany County, index No. 9381/87, Feb. 22, 1988 [emphasis added]).
In order to make participation in the Mitchell-Lama program more attractive to developers, the Legislature added a new subdivision (2) to Public Housing Law § 322 in 1960 (L 1960, ch 669 [now Private Housing Finance Law § 35 (2)]), which provides as follows: "A company aided by a loan made after May first, nineteen hundred fifty-nine, may voluntarily be dissolved, without the consent of the commissioner or of the [supervising agency], as the case may be, not less than twenty years after the occupancy date upon the payment in full of the remaining balance of principal and interest due and unpaid upon the mortgage or mortgages and of any and all expenses incurred in effecting such voluntary dissolution.” (Emphasis supplied.)
The 1960 amendment, which applies to housing companies aided by loans made after May 1, 1959 (such as plaintiffs in this action), thus reduces the minimum duration of a company’s participation in the Mitchell-Lama program before it may voluntarily dissolve from 35 years to 20 years, and eliminates the requirement of obtaining the consent of the Commissioner or of the supervising agency. As Senator Mitchell wrote:
"Specifically, the artful statutory scheme of Mitchell-Lama law provides that, in exchange for low-interest mortgages *812 from the State and partial municipal real property tax-exemptian, the maximum annual return to the owners of rental property is severely limited and their right to freely alienate their property sharply restricted. To insure private investment and development in the face of these restrictions, however, the Legislature granted such housing companies the unfettered right to voluntarily dissolve and sell or rent their property at market value after the statutorily prescribed period without the consent of the Commissioner. Thus, in return for its promise to allow housing companies the unqualified right to freely convey or reconstitute their projects on satisfaction of specific and exclusive statutory requirements, the State received what it bargained for: the construction and operation of middle income housing. * * *
"This 20-year voluntary dissolution provision, in its entirety, became a permanent essential element of the successful statutory scheme to encourage private free enterprise to invest in these regulated companies and soon resulted in a flood of applications .from prospective sponsors and an immediate spurt of building activity throughout the state” (MacNeil affidavit, Matter of Winthrop Gardens [Elmicke], supra [emphasis supplied]).
Defendants argue that "the Leland and Kingsbridge mortgage notes gave to the city absolute discretion to determine whether prepayments would be accepted”. This argument runs counter to the express language and legislative history of Private Housing Finance Law § 35 (2). As one commentator has written: "DHCR or HPD surely could not, by regulation, give itself the power to prohibit a buyout; the statute explicitly denies the agencies that power. It is extremely unlikely that the courts would permit the state or city, acting in its capacity as mortgagee, and placing this restriction in a note or mortgage rather than a rule or regulation, to thereby reach the prohibited result. Accordingly, the 'consent’ clause in the mortgage should be read so as to permit mortgagees to impose only requirements that relate to procedural matters such as the manner in which the buyout is to be arranged and the fees to be charged. This right does not include the power to reject the prepayment application 'on the merits’.” (Sweet & Hack, Mitchell-Lama Buyouts: Policy Issues & Alternatives, 17 Fordham Urb LJ 117, 128-129, n 73 [1989].)
As stated supra, both the Kingsbridge and Leland mortgage notes gave "the privilege to the maker of prepaying all *813 or part of the principal sum hereof at such time or times, in such amount or amounts, and on such terms as [HPD] may authorize and approve.” Contrary to defendants’ assertions, this provision does not give them carte blanche to reject, without giving any reason, a notice of intention to exercise the maker’s right to prepay the mortgage, a right embodied in their agreement and created by an act of the Legislature. Such a construction would defeat the reasonable expectation of plaintiffs at the time they agreed to enter the Mitchell-Lama program and would deprive them of the benefit of their bargain. Defendants’ argument that they needed time to study the ramifications of Mitchell-Lama buyouts and that DHCR has working on emergency regulations to cover the situation (apparently no such regulations had been promulgated during the 27-year period between the enactment of Private Housing Finance Law § 35 [2] and plaintiffs’ attempt at exercising their right to go private) is of no merit. Additionally, section 35 was recently amended in 1989 and the Legislature did not see fit to alter the language of subdivision (2) in any way. Plaintiffs were entitled to have their applications promptly processed on the basis of the law existing at the time (see, Matter of Amsterdam-Manhattan Assocs. v Joy, 42 NY2d 941, 942 [1977]; Matter of Parkview Holding Corp. v New York City Conciliation & Appeals Bd., 60 AD2d 845 [2d Dept 1978]).
Defendants’ argument that there are good reasons why a prudent mortgagee would decline to accept prepayment of the mortgage is insufficient, for purposes of opposing a motion for summary judgment, to establish a bona fide triable issue of fact as to whether defendants indeed had a good reason for declining to accept prepayment. Only the existence of a bona fide issue raised by evidentiary facts, and not one based on conclusory or irrelevant allegations will suffice to defeat summary judgment (Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 NY2d 285, 290 [1973]).
Accordingly, that branch of the motion by plaintiffs Leland and Kingsbridge for summary judgment on their causes of action for breach of contract is granted, and defendants’ cross motion for summary judgment dismissing the complaint is denied. The matter is set down for an immediate trial on the issue of damages (CPLR 3212 [c]) upon the filing of a note of issue and certificate of readiness and payment of appropriate fees to the clerk.

 E.g., higher rents due to refinancing of the mortgage at market rates rather than the low State-subsidized rate; loss of tax abatement from the municipality; and a lifting of the cap on the permissible rate of return afforded to the operator.