■ WATRAL & SONS, INC., Respondent, v OC RIVERHEAD 58, LLC, Appellant, et al., Defendants. [824 NYS2d 392]—

In an action to foreclose a mechanic's lien, the defendant OC Riverhead 58, LLC, appeals, as limited by its brief, from so much of a judgment of the Supreme Court, Suffolk County (Costello, J.), dated March 31, 2005, as, upon an agreed-upon statement of facts, is in favor of the plaintiff and against it in the principal sum of $82,401.

Ordered that the judgment is modified, on the facts, by deleting the provision thereof awarding the plaintiff damages in the principal sum of $82,401, and substituting therefor a provision awarding the plaintiff damages in the principal sum of $12,762; as so modified, the judgment is affirmed insofar as appealed from, without costs or disbursements.

The defendant OC Riverhead 58, LLC (hereinafter the defendant), owns a parcel of property in Riverhead, located across from the Tanger Mall. On December 6, 1999 the defendant entered into an agreement with the plaintiff Watral & Sons, Inc., for the performance of excavation work in connection with a project to construct an Applebees Restaurant on the premises. The adjusted contract price for the plaintiff's work, including certain additions and credits reflected by change orders, was $167,401.

At issue on appeal is the scope and interpretation of two indemnification provisions set forth in the parties' contract. The first provision, subparagraph 4.18.1 is essentially a statement of the plaintiff's common-law duty to indemnify the defendant owner for personal injury and property damage caused by the plaintiff's own negligence. To this end, subparagraph 4.18.1 states that "[t]o the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Owner . . . from and against all claims, damages, losses and expenses . . . arising out of resulting from the performance of the Work" provided that any such claim "is caused in whole or in part by any negligent act or omission of the Contractor." Subparagraph 4.18.1 concludes by stating that this obligation to indemnify "shall not be construed to negate, abridge or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this Paragraph."

The second indemnification provision in the parties' contract is set forth in article 10 of the contract, entitled "Protection of Persons and Property." Subparagraph 10.2.1 of this article begins by requiring the plaintiff contractor to "take all reasonable precautions" for the safety of employees and other persons at the work site, and to "provide all reasonable protection" to prevent damage, injury or loss to property. Pursuant to subparagraph 10.2.1, clauses 2 and 3, the property required to be protected from damage consists, inter alia, of materials, equipment, and "other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction." Subparagraph 10.2.5 of the contract then imposes a duty upon the plaintiff to "promptly remedy all damage or loss . . . to any property referred to in Clauses 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor . . . and for which the Contractor is responsible under Clauses 10.2.1.2 and 10.2.1.3, except damage or loss attributable to the acts or omissions of the Owner, the

Architect, the Construction Manager or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, and not attributable to the fault or negligence of the Contractor." This provision then concludes by specifying that "the foregoing obligations of the Contractor are in addition to the Contractor's obligations under Paragraph 4.18".

According to an agreed-upon statement of facts, on August 3, 2000, one of the plaintiff's employees was performing excavation work for the installation of a sewer line when his backhoe struck and damaged an underground power cable that supplied electricity to an adjacent property owned by Adchem Corporation. Prior to commencement of the excavation work, a project superintendent employed by the defendant's construction manager had notified "New York One Call" that work was being performed at the site, and had called for marking of the electric line. However, it appears that after the marking was performed, an electrician relocated the cable because it was interfering with construction. When the area where the cable was struck was examined, it was also discovered that "excess cable, in the form of a loop, had been buried, at the time of the original cable installation." It is not clear from the stipulated facts whether the excavator struck the cable because it had been relocated after marking of the electric line, or because the loop of excess cable protruded beyond the marked area. In any event, after this incident, the plaintiff agreed to pay $8,000 for the materials necessary to repair the cable, and the electrician who had relocated the cable agreed to supply his labor.

Two weeks later, on August 17, 2000, one of the plaintiff's employees was performing excavation work near the site where the cable had been damaged in order to adjust the height of the sewer. The project superintendent was present, and was supervising the height adjustment. During the course of this work, the ground adjacent to the excavation gave way, dragging the cable toward the excavation site. Although the excavator's backhoe did not actually come in contact with the cable, the cable was once again damaged and electric service to Adchem's property was disrupted.

During the spring and summer of 2000 the defendant paid the plaintiff a total of $85,000 for its work. However, the defendant withheld payment of the $82,401 balance due under the parties' agreement, apparently because it was involved in a dispute with Adchem over damages caused by the disruption of electric service to its property. The defendant

subsequently resolved the dispute by paying Adchem a total of $69,639.

The plaintiff filed a mechanic's lien against the property in January 2001 and thereafter commenced this action to foreclose the lien. After the parties submitted the matter to the Supreme Court on their agreed-upon statement of facts, the court found in favor of the plaintiff, concluding that subparagraphs 4.18.1 and 10.2.5 of the parties' contract, read in pari materia, revealed an intent to require the plaintiff to answer only for its own negligent acts. The court further concluded, based upon the stipulated facts, that the plaintiff had not been negligent in striking the cable on August 3, 2000 or responsible for the additional damage caused when the ground adjacent to the excavation gave way on August 17, 2000. In support of its conclusion, the court pointed out that the cable had been relocated by others prior to the incident on August 3, 2000 and that the plaintiff had not been the only entity working at or near the location of the cable when the cave-in occurred on August 17, 2000. A judgment in favor of the plaintiff and against the defendant in the principal sum of $82,401 was thereafter entered, and this appeal ensued.

On appeal, the defendant contends that it is entitled to indemnification for the damage caused by the plaintiff's work pursuant to subparagraph 10.2.5 of the contract, and that the Supreme Court erred in reading this provision in pari materia with subparagraph 4.18.1. We agree. "A party is entitled to full contractual indemnification provided that the 'intention to indemnify can be clearly implied from the language and purposes of the entire agreement and the surrounding facts and circumstances' " (*Drzewinski v Atlantic Scaffold & Ladder Co.*, 70 NY2d 774, 777 [1987], quoting *Margolin v New York Life Ins. Co.*, 32 NY2d 149, 153 [1973]; *see Torres v Morse Diesel Intl., Inc.*, 14 AD3d 401 [2005]; *Kennelty v Darlind Constr.*, 260 AD2d 443 [1999]). Here, we find that subparagraph 10.2.5 of the parties' contract clearly reflects an intent to require the plaintiff to indemnify the defendant for property damage caused by its work, even in circumstances where the plaintiff's negligence cannot be established, and that this intent to indemnify is supported by a reading of the contract as a whole.

Analysis of this issue must begin by recognizing that subparagraphs 4.18.1 and 10.2.5 of the contract are separate and distinct indemnification provisions which impose differing duties upon the plaintiff. Under subparagraph 4.18.1, which is essentially a restatement of the contractor's duty

under the common law, the plaintiff was required to indemnify the defendant against personal injury and property damages claims arising in whole or part from its negligent acts or omissions. In contrast, subparagraph 10.2.5 does not limit the plaintiff's duty to indemnify to damages caused by its own negligence. Rather, subparagraph 10.2.5 imposes an obligation upon the plaintiff to remedy any damage or loss to the persons or property specified in article 10 of the contract, without regard to the plaintiff's negligence, unless such loss is attributable to the acts or omissions of the defendant owner, architect, or construction manager of the project. Thus, subparagraph 10.2.5 serves to broaden the plaintiff's liability under common-law rules of implied indemnity by requiring it to remedy any damage or loss arising out of its work regardless of whether the plaintiff has been negligent (*see generally Brown v Two Exch. Plaza Partners*, 76 NY2d 172, 178 [1990]).

The conclusion that subparagraph 10.2.5 was intended to impose a broader duty of indemnification upon the plaintiff than subparagraph 4.18.1 is fully consistent with the language of these provisions. Subparagraph 10.2.5 specifically states that the obligations imposed by it "are in addition to the Contractor's obligations under Paragraph 4.18." Moreover, subparagraph 4.18.1 concludes by stating that the obligations it imposes "shall not be construed to negate, abridge or otherwise reduce any other right or obligation of indemnify which would otherwise exist." It is clear from this language that subparagraph 10.2.5 was intended to impose additional and broader obligations than subparagraph 4.18.1. By reading these two separate and distinct provisions together, and concluding that subparagraph 10.2.5 only required the plaintiff to remedy damage caused by its own negligence, the court essentially rendered subparagraph 10.2.5 meaningless.

Nor are we persuaded by the dissent's position that subparagraph 6.2.4 of the contract, which neither party has alluded to on appeal, serves to narrow the scope of subparagraph 10.2.5 by limiting the plaintiff's obligation to remedy all property damage or loss to situations where the plaintiff "wrongfully" causes the loss. Subparagraph 6.2.4 is located in a section of the contract which sets forth the mutual responsibilities of the contractor and owner, and it provides that "should the Contractor wrongfully delay or cause damage to the work or property of the Owner, or to other work or property on the site, the Contractor shall promptly remedy such damage as provided in Subparagraph 10.2.5." While subparagraph 6.2.4 does require the

plaintiff to remedy any damage it "wrongfully" causes "as provided in Subparagraph 10.2.5", subparagraph 10.2.5 is itself broader and contains no language limiting its applicability to damage which was either wrongfully or negligently caused by the contractor.

Moreover, both incidents which resulted in damage to the cable and the disruption of electric service to the neighboring property fall within the scope of subparagraph 10.2.5. Pursuant to subparagraph 10.2.1.3 of the contract, the plaintiff was required to provide all reasonable protection to prevent damage, injury, or loss to property at the site or adjacent thereto, including "utilities not designated for removal, relocation or replacement in the course of construction." Furthermore, under subparagraph 10.2.5, the plaintiff was required to remedy all damage or loss to any property referred to in subparagraph 10.2.1.3, and for which it was responsible under that provision. Since the plaintiff was responsible for the safekeeping of the subject cable under subparagraph 10.2.1.3, it was required to remedy any damage or loss related to the cable caused by its work.

In accordance with General Obligations Law § 5-322.1, which prohibits enforcement of a contractual indemnification clause where the party seeking indemnification was negligent (*see Davis v All State Assoc.*, 23 AD3d 607 [2005]; *Zarem v City of New York*, 6 AD3d 276 [2004]), subparagraph 10.2.1 of the parties agreement also specifies that the plaintiff is not required to remedy any damage or loss which is attributable to the negligence of the defendant, its construction manager, or its architect. However, there is no evidence of such negligence here. While the stipulated facts are sparse, they reveal that prior to the commencement of the plaintiff's excavation work, a project superintendent employed by the construction manager contacted "New York One Call." "New York One Call" is apparently a reference to a "one-call notification system" established pursuant to General Business Law §§ 760 and 761 to protect "underground facilities" such as electric power cables from damage due to excavation and demolition work. Where an underground facility is located within 15 feet of the proposed work area, upon notification its operator must mark the location of the facility before excavation work can proceed (*see* General Business Law § 764 [3]). The stipulated facts further indicate that the location of the subject electric line was staked out after notification was made to the one call system, but that an electrician performing work at the site thereafter moved the cable without mov-

ing the flags which marked the location of the cable. Under these circumstances, there is no basis for concluding that any negligence on the part of the defendant or its construction manager caused or contributed to the occurrence of the first incident. In addition, there is no indication in the record that the defendant or the construction manager were at fault in the occurrence of the second incident, in which the cable was damaged and electric service disrupted when the ground adjacent to the excavation gave way. In the absence of any evidence that the defendant or its construction manager were at fault in the occurrence of either incident, enforcement of the indemnification provision set forth in subparagraph 10.2.5 is mandated by the parties' own agreement, and is not barred by General Obligations Law § 5-322.1.

In any event, even assuming that the defendant is not entitled to full contractual indemnification pursuant to subparagraph 10.2.5, the defendant is entitled to indemnification both pursuant to subparagraph 4.18.1 and common-law indemnification principles. Although the Supreme Court found no evidence that the plaintiff was at fault for either of the incidents in which the cable was damaged, the stipulated facts point to a contrary conclusion. With respect to the first incident, the defendant correctly points out that an excavator such as the plaintiff has a statutory duty to protect underground facilities from damage by verifying the precise location of such facilities, and by "preserving the staking, marking or other designation by the operator until no longer required for proper and safe excavation or demolition work at or near the underground facility" (General Business Law § 764 [2], [4]). Here, although the parties agree that the one call system was notified of the proposed work, and marking was performed, the plaintiff's excavator nevertheless struck the cable, either because it had been relocated after the marking, or because excess cable had been buried in the form of a loop and protruded away from the marked area. While the plaintiff had no role in relocating the cable and was unaware that excess cable had been buried, it nevertheless cannot be considered completely free of fault. If the first incident was caused solely because the plaintiff was unaware that the cable had been relocated and the markings were no longer accurate, it breached its duty to verify the precise location of the underground cable before it commenced its work, and failed to ensure that the markings remained properly located. If the first incident was caused by the excess cable buried when the electric line was originally installed, the plaintiff still was

negligent in performing its work too closely to the marked area.

The record also supports a conclusion that the plaintiff breached its duties as an excavator in connection with the second incident. Pursuant to General Business Law § 764 (4), an excavator must, among other things, "provide support to and prevent damage to any underground facility or its protective coating" in accordance with the rules and regulations adopted by the Public Service Commission. These rules and regulations require excavators to "provide prompt and adequate support and protection for every underground facility located in the work area," either in accordance with specifications by the operator, or "with generally accepted engineering practice, including but not limited to shoring and bracing" (16 NYCRR 753-3.12), and to backfill the excavation "in such manner as will avoid damage to, and provide proper support for, such underground facility and its protective coating both during and after backfilling operations" (16 NYCRR 753-3.13). Here, it is undisputed that the electric cable servicing Adchem's property was damaged for a second time when the ground adjacent to the excavation gave way while the plaintiff was adjusting the height of the sewer. Although the Supreme Court found that the second incident could not be attributed to the plaintiff's negligence because other entities were working at or near the site, as an excavator, the plaintiff was the entity that had a statutory duty to properly shore and brace the excavation for the protection of underground facilities. Since the ground adjacent to the excavation gave way while the plaintiff was adjusting the height of the sewer line, it is clear that the plaintiff breached its duty to properly shore and brace the excavation for the protection of electric power line. Under these circumstances, it cannot be said that the plaintiff was free from negligence in the happening of the second incident.

Contrary to the dissent's suggestion, our conclusion that the plaintiff was negligent because it failed to properly shore and brace the excavation as required by the implementing rules and regulations pursuant to General Business Law § 763 is not dependent upon the existence of a private right of action in favor of property owners. The plaintiff had a duty to avoid damage to the underground electric cable (*see Suffolk County Water Auth. v J.D. Posillico, Inc.*, 191 AD2d 422 [1993]), and the plaintiff's violation of the statute's implementing rules and regulations certainly constitutes some evidence of negligence which may be properly considered by the factfinder (*see Bauer v Female Acad-*

*emy of Sacred Heart*, 97 NY2d 445, 453 [2002]; *Elliott v City of New York*, 95 NY2d 730 [2001]; *Amirr v Calcagno Constr. Co.*, 257 AD2d 585 [1999]).

Finally, we note that the dissent questions whether subparagraph 10.2.5 entitles the defendant to full reimbursement for the sums it paid Adchem as compensation for its losses, which included the disruption of electrical service. Notably, the parties stipulated to the amount paid to Adchem for its losses, and the plaintiff does not argue that compensation for disruption of electrical service is beyond the scope of subparagraph 10.2.5, which requires it to "remedy all damage or loss" to property at the site or adjacent thereto. Moreover, we have also concluded that the defendant is entitled to indemnification pursuant subparagraph 4.18.1, which requires the plaintiff to hold the defendant harmless from and against all claims and losses arising out of the plaintiff's negligence. Under these circumstances, we find that the defendant is entitled to indemnification from the plaintiff in the sum of $69,639, representing the sum paid to the neighboring property owner Adchem for damage to the cable and disruption of service. Accordingly, the judgment appealed from should be modified by awarding the plaintiff only the balance remaining due under the contract after the deduction for Adchem's losses, a principal sum of $12,762. Krausman, Goldstein and Mastro, JJ., concur.

Fisher, J. (dissenting and voting to affirm the judgment insofar as appealed from with the following memorandum, in which Prudenti, P.J., concurs): Because, in my view, the plain meaning of the parties' agreement, coupled with the sparsity of the record, precludes any finding that the appellant is entitled to contractual indemnification, I respectfully dissent.

In December 1999 the defendant OC Riverhead 58, LLC (hereinafter OC), as owner, and the plaintiff Watral & Sons, Inc. (hereinafter Watral), as contractor, entered into a contract for the performance of excavation, drainage, and sanitary work on property located on County Road 58, in Riverhead. The total contract price, including all change orders, was $167,401. The defendant paid the plaintiff only $85,000, leaving an outstanding balance of $82,401. On January 31, 2001 Watral filed a mechanic's lien for that amount and subsequently commenced this action to foreclose the lien. OC asserted a counterclaim, contending that it was entitled to contractual indemnification from Watral in the amount of $69,639 and therefore should be permitted to deduct that amount from the outstanding balance on the contract. The claimed indemnification related to money

allegedly expended by OC to compensate a neighboring land-owner for disruption of electrical power caused during the course of the work.

The only facts before us are those contained in a brief agreed-upon statement of facts executed by the parties on August 14, 2003 and presented to the Supreme Court. In relevant part, the statement provides:

"5. On August 3, 2000, while [Watral] was excavating for the sewer the electric cable providing power to an adjacent land-owner, ADCHEM Corporation was damaged.

"6. The original power cable, supplying electricity to [Ad-chem], had been relocated by others as it interfered with the construction of the project.

"7. Prior to [Watral's] excavation for the installation of the sewer line, New York One Call had been notified. Flags marked the electric line servicing ADCHEM. The call for marking was performed by Charles Voyles, project superintendent employed by Sindrome Construction, Inc., construction manager for the project and the owner representative on the site.

"8. [Watral]'s excavator was digging ten to fifteen feet from the marked line, when it struck the cable. Only the outer coating of the cable was damaged. There was no spark, no noise and no signs of rupture to the cable. After closer examination, it was determined that excess cable, in the form of a loop had been buried, at the time of the original electric cable installation.

"9. It was decided among [Watral], Sindrome Construction, Inc. as the owner['s] representative and the electrician that performed the original cable relocation, that [Watral] would pay the cost of the material, $1,000 per splice for the 8 strands in the cable and the electrician would supply the labor to effectuate the splices. The excess loop of wire was removed.

"10. On August 17, 2000, [Watral] was excavating in the same location to adjust the height of the sewer. The project superintendent Charles Voyles was present and supervising the height adjustment. The excavated material was placed two feet from the edge of the excavation. The ground adjacent to the excavation gave way dragging the cable towards the excavation site. There was a loud pop and a spark. The excavator did not come in contact with the cable and there were no burn marks on the side of the bucket. The electric cable providing power to

[Adchem] was damaged at the site of the splice made to correct the damage of August 3, 2000."

The $8,000 in material costs that Watral agreed to pay to OC following the first incident was subsequently reflected in a change order and is not at issue in this action. However, between December 2000 and April 2001, OC allegedly paid neighboring landowner, Adchem, a total of $69,639 for damages resulting from the interruption of power to its facility. In its counterclaim, OC sought to recover those payments from Watral under the indemnity provisions of the contract.

The contract at issue was the American Institute of Architects standard contract. Its "General Conditions" section contains the following indemnification provision:

"4.18.1 To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Owner, the Architect, the Construction Manager, and their agents, and employees from and against all claims, damages, losses and expenses, including, but not limited to, attorneys fees arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) is caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this Paragraph 4.18."

Article 10 of the General Conditions contains the following additional provisions:

"10.2.1 The Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to: . . .

"3. Other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction . . .

"10.2.5 The Contractor shall promptly remedy all damage

or loss . . . to any property referred to in Clause [ ] . . . 10.2.1.3 caused in whole or in part by the Contractor, any Subcontractor, any Sub-subcontractor, anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, and for which the Contractor is responsible under Clause [ ] . . . 10.2.1.3, except damage or loss attributable to the acts or omissions of the Owner, the Architect, the Construction Manager or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Paragraph 4.18.''

Moreover, article 6 of the General Conditions contains the following provision:

''6.2.4 Should the Contractor wrongfully cause damage to the work or property of the Owner, or to other work or property on the site, the Contractor shall promptly remedy such damage as provided in Subparagraph 10.2.5.''

Based upon the agreed-upon statement of facts and the relevant language of the contract, the Supreme Court determined that OC had not established its right to contractual indemnification under either subparagraphs 4.18.1 or 10.2.5 of the contract. I agree.

''[T]he right to contractual indemnification depends upon the specific language of the contract'' (*Gillmore v Duke/Fluor Daniel*, 221 AD2d 938, 939 [1995]; *accord Kader v City of N.Y., Hous. Preserv. & Dev.*, 16 AD3d 461, 463 [2005]). Moreover, ''[w]hen a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed'' (*Hooper Assoc. v AGS Computers*, 74 NY2d 487, 491 [1989]; *see also Tonking v Port Auth. of N.Y. & N.J.*, 3 NY3d 486, 490 [2004]). Guided by these principles, the court correctly determined that OC's right to indemnification pursuant to subparagraph 4.18.1 of the contract was contingent, inter alia, on proof that the damage or loss was caused in whole or in part by Watral's negligence, or by the negligence of someone for whose acts Watral may be liable.

There is no proof that the first accident was caused by Watral's negligence. To the contrary, the parties stipulated that

the electrical cable servicing the Adchem property was not where it was supposed to be, but "had been relocated by others" prior to the commencement of Watral's work. Under these circumstances, there is no proof of negligence on Watral's part and, because the record does not disclose the identity of the electrician responsible for the relocation of the cable, it cannot be determined whether that person was someone for whose acts Watral may be liable, so as to trigger indemnity pursuant to subparagraph 4.18.1 of the agreement.

With respect to the second accident, which occurred two weeks later, the agreed-upon facts reveal only that the same electrical cable was damaged when the ground adjacent to Watral's excavation gave way, dragging the cable towards the excavation site. An employee of the construction manager was present and supervising Watral's work at the time. There was no contact between the excavation equipment and the cable, and the only damage to the cable was at the site of the previous repair, made only two weeks earlier. Based on nothing more than this, I cannot conclude that the damage to the cable was caused by Watral's negligence.

The majority reasons that Watral, as an excavator, had a statutory duty to provide support and prevent damage to the underground cable and its protective coating pursuant to section 764 (4) of the General Business Law, and that evidence of a ground collapse adjacent to the excavation site conclusively establishes Watral's statutory liability and, therefore, its negligence. I respectfully disagree. Even assuming that Watral violated a duty *owed to the operator of the cable* (as that term is defined in General Business Law § 760 [6]; *see New York Tel. Co. v Harrison & Burrowes Bridge Contrs.*, 3 AD3d 606 [2004]), the consequences of such a violation are spelled out in section 765 of the General Business Law, and include, inter alia, an obligation to indemnify the *operator of the cable* for the "reasonable costs" incurred in repairing or providing new support for it (*see* General Business Law § 765 [4]). Notably, such consequences do not include a private right of action in favor of *property owners* such as OC (*cf. N. A. Orlando Contr. Corp. v Consolidated Edison Co.*, 131 AD2d 827 [1987]; *Lizza Indus. v Long Is. Light Co.*, 44 AD2d 681, 682-683 [1974]; *see also* Public Service Law § 119-b [7]), much less an open-ended obligation to compensate third parties for economic losses resulting from the interruption of electrical power. While excavators remain liable for the consequences of their own negligent acts or omissions (*see* General Business Law § 765 [2]; *see also, Buckeye Pipeline*

*Co. v Congel-Hazard, Inc.,* 41 AD2d 590 [1973]), section 764 of the General Business Law does not expand the scope of their common-law duty of care. Thus, in my view, evidence of a statutory violation, without more, does not establish Watral's negligence for purposes of determining OC's right to contractual indemnification under the circumstances presented.

The majority's reliance on subparagraph 10.2.5 as an alternate basis for indemnification is similarly misplaced. The majority reads subparagraph 10.2.5 as imposing strict liability on Watral for any and all direct and indirect losses resulting from any damage to underground cables caused by Watral's work, except to the extent such losses are shown to be attributable to OC's acts or omissions and not at all attributable to Watral's own negligence. That is not, however, what the contract provides.

Insofar as relevant here, subparagraph 10.2.5 requires Watral to remedy any and all damage it causes to any property referred to in clause 10.2.1.3 and for *which it is responsible under clause 10.2.1.3.* But Watral's responsibility under clause 10.2.1.3 is not absolute. It is obligated only to take all *reasonable* precautions for the safety of, and provide all *reasonable* protection to prevent damage to, underground utilities. Thus, it is only in the event that Watral's responsibility under clause 10.2.1.3 is engaged that Watral's duty to indemnify OC for any resulting property damage is triggered. This interpretation of subparagraph 10.2.5 finds support in subparagraph 6.2.4, which makes clear that Watral's obligation under subparagraph 10.2.5 is limited to damage *"wrongfully* cause[d] to . . . work or property on the site."

Contrary to the views expressed by the majority, I cannot read subparagraph 10.2.5—particularly in light of subparagraph 6.2.4—as imposing strict liability on Watral. Indeed, the majority's interpretation of subparagraph 10.2.5 renders Watral liable for any damage to underground utilities caused by Watral's operations, regardless of whether Watral's actions were in any way "wrongful" as contemplated by subparagraph 6.2.4, and irrespective of whether Watral took "all reasonable precautions" to avoid such damage, as contemplated by clause 10.2.1.3. Such a result is "unsupportable under standard principles of contract interpretation" (*Lawyers' Fund for Client Protection of State of N.Y. v Bank Leumi Trust Co. of N.Y.,* 94 NY2d 398, 404 [2000]; *see Matter of Columbus Park Corp. v Department of Hous. Preserv. & Dev. of City of N.Y.,* 80 NY2d 19, 31 [1992]) and, in effect, turns Watral into an insurer.

In fact, under the majority's view, Watral's duty under subparagraphs 10.2.5 and 6.2.4 is arguably greater than that of

an insurer. It includes not only the obligation to repair the damaged cable but also to indemnify OC for sums paid to an adjacent landowner allegedly to compensate it for losses resulting from the interruption of electrical service to its facility even though the circumstances surrounding such alleged losses remain unknown and undisclosed. The scope of Watral's obligation under subparagraphs 10.2.5 and 6.2.4 is to indemnify OC against "damage or loss . . . to any property referred to in Clause [ ] . . . 10.2.1.3" (emphasis added). The "property" in this case is the subject cable. Yet the majority holds, in effect, that "property" damage also potentially includes purely economic injury suffered by any third party whose electrical supply happens to travel through the damaged cable. I cannot agree.

Indeed, irrespective of whether Watral's contractual liability is predicated on subparagraphs 10.2.5 and 6.2.4 or on subparagraph 4.18.1, it is impossible, on this record, to determine whether OC's request for indemnification with respect to Adchem's third-party claim is viable, as the threadbare record raises more questions than it answers. There is no evidence before us, for example, as to who owned and operated the subject cable, or as to what duty of care, if any, OC owed to Adchem. There is no evidence in the record as to whether Adchem actually suffered any damage to its own property as a result of the damage to the cable, or, instead, sustained purely economic injury. And there is no evidence as to whether OC's payment to Adchem was voluntary or legally compelled. These are basic questions (*cf. 532 Madison Ave. Gourmet Foods v Finlandia Ctr.,* 96 NY2d 280 [2001]; *see generally* Annotation, *Liability of One Other than Electric Power or Light Company or its Employee for Interruption, Failure, or Inadequacy of Electric Power,* 15 ALR4th 1148) that must be answered before a determination can be made as to whether OC is entitled to contractual indemnification in this case.

In sum, the agreed-upon statement of facts is too sparse, in my view, to support the majority's conclusion that OC is entitled to indemnification from Watral, particularly for the type of damages it seeks. And, because it was incumbent upon OC to show that it was entitled to that indemnification, and because it has failed to do so, the judgment should be affirmed insofar as appealed from.